# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LILLY KINNEAR, o/b/o
KASSEYOPIA KINNEAR,

        Plaintiff,

v.                                         No. CIV 03-785 LFG

JO ANNE B. BARNHART,
Commissioner, Social Security
Administration,

        Defendant.

## MEMORANDUM OPINION AND ORDER

### Introduction

    Plaintiff Kasseyopia Kinnear ("Kasseyopia") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Kasseyopia's disability was correctly determined to have ceased effective March 1, 2000. In a motion filed January 23, 2004, Kasseyopia requests that this Court reverse the Commissioner's final decision, or remand for payment of benefits. [Doc. No. 12.]

    Kasseyopia was born on March 22, 1990 and was 11 years old when she testified at an administrative hearing held in Las Cruces, New Mexico on April 25, 2001. She is part Native American. Her mother, Lilly Kinnear, brings this motion on her behalf. Kasseyopia now is 14 years

old and currently attends school. She was born with spina bifida[1] and received surgery on the day of her birth to repair a lumbosacral myelomeningocele.[2] Kassey's prior application for SSI benefits was initially allowed on January 3, 1992, after a finding that her spina bifida condition equaled Listed Section 111.08. [Tr. at 20.] Those benefits continued through a number of years. On January 21, 2000, the Social Security Administration ("SSA") notified Kasseyopia that it was reviewing her case to determine if she was still disabled. [Tr. at 273.] On March 23, 2000, the SSA determined that Kasseyopia's condition had improved and that she was no longer entitled to benefits under the pertinent regulations. [Tr. at 276, 311.]

Kasseyopia requested a hearing before an Administrative Law Judge ("ALJ"), and that hearing was held on April 25, 2001. Kasseyopia was present at the hearing with her parents but was unrepresented. [Tr. at 36-63.] ALJ Larry E. Johnson determined that Kasseyopia's condition had improved and that her disability was correctly determined to have ceased. [Tr. at 19.] The ALJ found that Kasseyopia's condition did not meet listing criteria and was not functionally equivalent to a listing level impairment. [Tr. at 22, 26-30.] On May 23, 2002, the Appeals Council denied Kasseyopia's request for review. [Tr. at 8.] This appeal followed.

## Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *See* Hamilton v. Sec'y of Health and Human Services, 961 F.2d 1495, 1497-98 (10th Cir. 1992); Glenn

---

[1] Spina bifida is an embryologic failure of fusion of one or more vertebral arches; there are a number of subtypes of spina bifida based upon degree and pattern of deformity. [Tr. at 551.]

[2] Meningomyelocele is the protrusion of the spinal cord and its membranes through defect in the vertebral column. [Tr. at 555.]

v. Shalala, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Sisco v. United States Dep't of Health & Human Services, 10 F.3d 739, 741 (1993). A decision of an ALJ is not supported by substantial evidence if other evidence in the record overwhelms the evidence supporting the decision. See Gossett v. Bowen, 862 F.2d 802, 805 (10th Cir. 1988).

The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton 961 F.2d at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

79 F.3d 1007, 1009-1010 (10th Cir. 1996). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

## Standard for Evaluating Disability in Children[3]

In order for an individual under the age of 18 to qualify for benefits a sequential evaluation process is used which is comparable to the five step sequential evaluation used for adults. 20 C.F.R. § 416.924(a). The first step is a determination of whether the child has engaged in substantial gainful activity. 20 C.F.R. § 416.924(b). If it is determined that the child is not engaged in substantial gainful activity, the second step involves a determination of whether the impairment, or combination of impairments, is "severe." 20 C.F.R. § 416.924(c). The last step involves a determination whether the child has an impairment or impairments that meet a "listing." 20 C.F.R. § 416.924(d). If found to have met a "listing" then the child is determined to be disabled.

If a claimant does not meet the requirements for a "listing," she may equal them if the child's functional limitations in a number of areas are impaired. There are six domains of functioning to determine functional equivalence: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) ability to care for one's self; and (6) health and physical well being. 20 C.F.R. 416.926a(b)(1)(i) through (vi). A child's impairments functionally equal a "listing" if she has extreme limitations in one area of functioning or marked limitations in two areas of functioning. An extreme limitation is characterized as one that interferes "very seriously with [one's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. 416.926a(e)(3)(i). An extreme limitation is one that is given for the worst limitations but does not necessarily mean a total lack of loss of ability to function. With extreme

---

[3]A new law was enacted in late 1996 that imposed a more stringent standard for evaluating childhood disability claims than the earlier existing test. Jefferson v. Barnhart, 209 F. Supp. 2d 1200, 1202 (N.D. Okla. 2002). In addition, the functional equivalency regulations in 416.926a were amended in 2001, which marked a major change in the evaluation process employed by an ALJ in a childhood disability case. Id. at 1204-05.

limitations, the standardized testing score would be at least three standard deviations below the mean. Id. A marked limitation is characterized as a limitation that is more than moderate but less than extreme. Instead of "very seriously" interfering with one's abilities, a marked limitation interferes "seriously" with one's ability to initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2)(i).

In evaluating the effects of the impairment(s) on a child's functioning, various factors may be considered, including a comparison to similarly aged children without impairments, the combined effects of multiple impairments, how well the claimant initiates, sustains, and completes activities, how much help the child needs, unusual settings, early intervention and school programs, the impact of chronic illness over time, and effects of treatment (medication and other types of treatment). 20 C.F.R. 416.924a(b).

In making these determinations, the ALJ analyzes the objective medical evidence, along with the claimant's credibility. [Tr. at 27.]

### The ALJ's Determinations

Here, Judge Johnson decided, *inter alia*, that Kasseyopia had not engaged in substantial gainful activity since the alleged onset date but that she did have medically determinable impairments that were "severe," consisting of spina bifida with meningomyelocele status post de-tethering and a learning disability. [Tr. at 25.] The ALJ concluded, based on the whole record, that her condition(s) did not meet or medically equal the listing criteria for Listing §§ 111.08, 112.05 or 112.10. [Tr. at 25.]

The ALJ proceeded to analyze whether Kasseyopia's condition was functionally equivalent to a listing level impairment by examining the six domains that are set out above. After a comprehensive review of the medical and other evidence, Judge Johnson concluded there was no

evidence of impairment in the domains of attending and completing tasks, interacting and relating with others, and caring for oneself. [Tr. at 28.] He found less than marked limitations relative to the domains of acquiring and using information, moving about and manipulating objects, and health and physical well being. [Tr. at 28.] Because Kasseyopia's functional limitations were not found to be marked or severe under the pertinent regulations, the ALJ concluded that she was correctly determined as no longer disabled within the meaning of the Social Security Act and that her benefits were correctly terminated. [Tr. at 28-29.]

## Allegations of Error

In this appeal, Kasseyopia argues, through counsel, that the ALJ's functional equivalence evaluation was erroneous or unsupported. Specifically, Kasseyopia asserts that the ALJ's findings that Kasseyopia's limitations were no more than "less than marked" were erroneous or not supported by substantial evidence as to the domains of (1) acquiring and using information; (2) moving about and manipulating objects; and (3) health and well being. [Doc. No. 12, 13.] The Commissioner limits her discussion to these challenges and claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations. [Doc. No. 14.]

## Summary of Kasseyopia's Medical Condition and Schooling

On March 22, 1990, Kasseyopia was born at the Phoenix Children's Hospital and was discharged on April 3, after undergoing a surgical procedure that closed the myelomeningocele. Doctors noted she was in good condition after the surgery. [Tr. at 360, 367.] As of April 2, there was a mild increase in the degree of hydrocephalus but that condition improved. [Tr. at 375, 473.] On May 18, 1990, the doctor recorded that she was delighted in Kasseyopia's improvement and anticipated that she would walk independently. The record indicates that Kasseyopia would be at risk

for symptoms related to tethering of the spinal cord and development of hydrocephalus.[4] [Tr. at 479.]

In 1990, Kasseyopia's mother applied for disability benefits based on spina bifida and neurogenic bladder. [Tr. at 169.]. The family was living in a small community in Arizona at the time, and it seems that Kasseyopia was the youngest child of ten[5] in the family. [Tr. at 417.] Initially it appeared that her benefits application was denied in Arizona but the department continued to review the application and eventually granted benefits. [Tr. at 89, 96-97, 106-07, 109, 142, 147, 169, 408, 410, 427.] The family apparently lived off of several other childrens' benefits and then eventually off of Kasseyopia's benefits. [Tr. at 118, 129, 203.] Based on some of the income records submitted by the family, it appears that the parents were not employed, or were erratically employed at this time.

A medical record, dated June 27, 1991, indicates that Kasseyopia was born with a "milder case of spina bifida." She was a very happy, friendly child. She showed good voluntary movement and could roll, crawl, combat crawl and sit up. She could pull herself up to standing and stand with minimal assistance. She communicated appropriately. She had a slight foot drop on the right side and her right ankle was tight. [Tr. at 431.]

On July 30, 1991, Kasseyopia was wearing braces and was not walking at 14 months of age yet. [Tr. at 408.] However, a November 1, 1991 record shows that she had never had a shunt, did not have progressive hydrocephalus and was walking without assistance. [Tr. at 456.] On November 22, 1991, Kasseyopia underwent a tethered cord procedure involving a lumbar laminectomy with a microscopic release of a tethered cord. Kasseyopia was almost two years old then. Her chief

---

[4] A condition accompanied by an accumulation of cerebrospinal fluid within the skull. It is typically characterized by enlargement of the had, prominence of the forehead, brain atrophy, mental deterioration, and convulsions. Dorland's Illustrated Medical Dictionary.

[5] Different records indicate differing numbers of children in the family.

complaint concerned her right leg with progressive stiffening and decreased range of motion.  [Tr. at 437-440.]

There are very few medical records for a number of the years after Kasseyopia began receiving benefits in approximately 1992.  In 1994, she had a bilateral Achilles tendon lengthening procedure.  [Tr. at 632.]  An x-ray of her back then revealed no spine problems.  She was wearing diapers at this time.  [Tr. at 632.]  In August 1995, Kasseyopia was seen at the Children's Health Center in Phoenix.  She was able to walk for 10-15 minutes before needing to rest.  She complained of discomfort in her left ankle.  She was not receiving any therapy and had no orthotics.  She denied having accidents with respect to voiding and was urinating on her own.  She could pedal a tricycle and could dress independently.  [Tr. at 448-455.]  The record notes that she was doing very well.

A September 8, 1995 record indicates that this was her first post-op visit following the excision of a left heel cord scar.  She was well-healed as of this date.  [Tr. at 447.]

By late 1996, Kasseyopia and her family were living in Las Cruces.  She was in school and was doing acceptable work in a number of categories.  Her attendance was unacceptable and she read below her grade level.  Her spelling, math and writing were also below her grade level.  [Tr. at 343.]  She was absent from school a fair amount both in Arizona and New Mexico due to surgeries and/or illnesses.  [Tr. at 346.]  As of November 1996, she had just entered the New Mexico classroom and she did not know many letters or sounds and recognized only a few numbers.  However, the teacher felt she could learn.  [Tr. at 348.]  In December 1996, Kasseyopia was referred for academic evaluation due to a lack of progress in school  The school thought her spina bifida and medical problems might be affecting her progress in school.  [Tr. at 349.]

8

Her elementary report card for 1st and 2nd grades in 1997-99 shows mostly satisfactory scores, along with excellent ratings for conduct. [Tr. at 335.] Her physical education evaluation, dated February 11, 1997, indicates she was in regular physical education and had no difficulty getting around school. She was totally independent in all activities. [Tr. at 514.]

After she was referred for testing and evaluation in late 1996, she was tested in early 1997. The report for these tests is dated March 11, 1997. [Tr. at 503.] The specific reason for the referral was concern with Kasseyopia's progress in reading, poor progress in math, difficulty with spelling, problems with writing and concern with readiness for academic instruction. At the time, she was in regular first grade level classes. Kasseyopia's motor skills tested within normal limits. [Tr. at 504.]

This test report documents Kasseyopia's educational history. When she transferred to East Picacho Elementary School in Las Cruces in November 1996, she had had only five months of kindergarten. She had to miss some school in Las Cruces as well, and her teacher reported that she was behind her classmates academically. This school history indicates that Kasseyopia is the youngest of two children and that her father is employed. [Tr. at 505.] The report notes that Kasseyopia got along well with peers and adults. Kasseyopia's general performance and skill levels in the areas of work speed, activity level, fine motor skills, gross motor skills, listening skills, organization skills and motivation were "about the same" as compared to her class. She was rated lower in her written language skills. [Tr. at 506.]

On the Wechsler Intelligence Scale for Children (WISC-III), Kasseyopia obtained a 101 for verbal IQ and a 90 for performance IQ, with a full scale IQ of 95. [Tr. at 507.] Her overall performance was classified in the average range. [Tr. at 509.] In her speech and language evaluation, the evaluator stated that while Kasseyopia demonstrated significant difficulty with discourse skills,

9

her standardized test results did not meet criteria for special education services in the area of language. [Tr. at 509.] Her reading, overall math, and written language skills all were in the low average range. [Tr. at 510.] Her visual motor skills were average, and her motor-reduced visual perceptual skill was high average. A number of suggestions were made at the end of the report to improve Kasseyopia's abilities in reading, math and written language. [Tr. at 512.] However, she did not qualify for special education services.

On April 30, 1997, a report indicates that Kasseyopia had no physical disability other than her ability to run was affected. The physical education instructor should not have her participate in certain running activities if she stated that her foot was bothering her. [Tr. at 337.]

A July 15, 1997 medical record states that Kasseyopia had her back closed at six hours of age and had had de-tethering procedures done at ages 2 and then again later (illegible). [Tr. at 692.] She talked at age 12 months and walked at 14 months. She dressed independently and rode a bike without wheels. She could not skip. [Tr. at 692.] Kasseyopia had mild myopia but did not need glasses yet as of September 4, 1997. [Tr. at 696.] She later did need them.

Films taken of Kasseyopia's back, dated November 1997, show good position and alignment. Her disc spaces were well maintained. She had spina bifida involving L5 and the sacrum. [Tr. at 681.]

On August 20, 1998, Kasseyopia was seen at the Carrie Tingley Spina Bifida Clinic. Her mother reported that she had had two de-tethering surgeries, and that she had had a good recovery after the last one, possibly in 1997, and was ambulating better with much less pain. Mild swelling was noted by the doctor but it had decreased in size over time. [Tr. at 735.] Kasseyopia appeared fine upon exam. [Tr. at 738.]

A February 18, 1999 medical record indicates that Kasseyopia had done very well after her most recent operation and that the doctors would see her again in six months. Dr. Armstrong noted that she had had fecal incontinence once a week or so. She had some weakness in her legs. [Tr. at 533, 535.] On September 16, 1999, Kasseyopia reported no problems with incontinence. [Tr. at 529.] On October 21, 1999, she was seen by a neurosurgery consultant. Her MRI for recurrent mild bladder symptoms and back pain all looked very good. There was no evidence of re-tethering. [Tr. at 526.]

On January 21, 2000, Kasseyopia was informed that the Social Security Administration was going to review her case to determine if she was still eligible for benefits. [Tr. at 273.] A February 17, 2000 medical report indicates that Kasseyopia's mother reported that her daughter was doing very well. The previous problem with fecal incontinence was resolved using timed toilet training. She was doing well in third grade. Her last report card was excellent although there were some difficulties noted. [Tr. at 523, 708.]

A teacher questionnaire, filled out by Cassie Banks on March 6, 2000, showed that while Kasseyopia was in third grade, she was reading, doing math, writing and spelling at the second grade level. [Tr. at 351.] Her attention span was normal, and most of her behavior was not problematic. She had a small problem completing tasks. [Tr. at 351.]

A childhood disability evaluation, dated March 21, 2000, indicates a severe impairment but not at listing level. Her motor limitations were less than marked as were her cognitive skills. There were no limitations in other areas. [Tr. at 516.]

A letter, dated March 23, 2000, from the SSA reflected that Kasseyopia was improved and no longer disabled. She had had surgical repair of her back, could walk well and had no more

problems emptying her bladder. [Tr. at 276.] Kasseyopia was notified that she could have her disability benefits continued during her appeal process but that she might have to pay them back at some point. [Tr. at 281.]

On April 13, 2000, Kasseyopia's teacher wrote a letter to whom it may concern stating that she was below grade level progress. She was failing in math and was being referred for testing for a learning disability. [Tr. at 353.] Dr. James Drennan addressed a letter to whom it may concern on April 25, 2000. He stated that Kasseyopia's problems should be considered permanent, that she had a learning disability and would consider spina bifida to be a lifetime disability. [Tr. at 522.]

A Reconsideration Report, signed by her mother on May 7, 2000, indicates that Kasseyopia had hydronephrosis[6] involving her left kidney, that she had problems running, could not jump rope or kick balls, did a poor job doing household chores, read poorly, could not read, and write or spell easily. She could, however, ride a bike according to her mother. [Tr. at 283-287.]

On May 10, 2000, Dr. Cynthia Smith addressed a letter to whom it may concern. She stated that she had followed Kasseyopia on a yearly basis and that she must continue with follow-up appointments because people with spina bifida can develop bladder problems that lead to renal failure. Dr. Smith noted that all was well with Kasseyopia at this appointment. [Tr. at 521.]

On May 18, 2000, Dr. Margaret Armstrong wrote a letter on Kasseyopia's behalf to whom it may concern. She stated that while Kasseyopia and her family managed well, Kasseyopia had a life-long disabling condition that required continued care to allow her to function in a normal setting. She

---

[6]Distention of the pelvis and calices of the kidneys with urine, as a result of obstruction of the ureter. Dorland's Illustrated Medical Dictionary, 785 (28th ed. 1994).

was a risk for complication of her neurogenic bladder[7] unless monitored closely and at risk for recurrence of a tethered cord.  [Tr. at 520.]

A Childhood Disability Evaluation Form, marked Advisory at the top, will filled out by consulting physician Dr. Rayme Romanik on May 25, 2000.  [Tr. at 540.]  Dr. Romanik concluded that Kasseyopia had severe impairments but that they did not meet listing criteria.  She had less than marked limitations in the areas of cognitive/communication and motor skills.  [Tr. at 542.]  There were no limitations in the areas of social skills, personal attainment skills and concentration, persistence or pace.  Dr. Romanik wrote:

> 10 year old with spina bifida (sacral myelocele) at birth with surgical correction the first day of life.  She did quite well with only some left LE problems until about 8/91 (17 mos) when she was noted to have worsening LLE problems.  By 11/91 she had a circumducted gait and underwent a laminectomy secondary to a tethered cord.  In 12/91 her urologist . . . apparently reported to the DDs that she had neurogenic bladder and child was met to listing 111.08B1 – although this child was not yet 2 years old!  Since then the child has learned to empty her bladder by voiding and has no bladder residuals, incontinence or UTIs.  She has no evidence of hydronephrosis and VCUG demonstrates no reflux.  She used to have problems with fecal soiling as well but has learned to control this with a timed toileting program.  In 7/94, she underwent Achille tendon release and required excision of left heal scar and adhsiolysis in 9/95 as a result of the 7/94 surgery.  At present she ambulates well and her extremities are straight and without deformity or contracture.  She is not in special ed and is generally performing well in school.  IQ and achievement testing in 1/97 revealed normal IQ . . . .  Per her third grade teacher, however, this child is reading at the second grade level and is failing math.  She is to be retested for an LD problem at sometime in the future.

[Tr. at 544.]

---

[7]A neuropathic or neurogenic bladder is any defective functioning of the bladder due to impaired innervation.  [Tr. at 556.]

A Las Cruces Confidential Diagnostic Evaluation was performed June 9, 2000, at the request of Kasseyopia's third grade teacher, Cassie Banks. [Tr. at 610.] Kasseyopia had displayed problems with understanding directions and requesting help when needed. But she completed her assignments, attended class regularly, paid attention and was cooperative. She got along well with adults and peers and liked school  Her overall mental processing skills were rated in the upper range of low average. [Tr. at 612, 616.] Her nonverbal and verbal intelligence scores were average. Her reading and spelling scores were the lowest and presented the biggest problem for her. The report states that the findings were "consistent and indicate that she meets the criteria of a Specific Learning Disability." [Tr. at 616.] A number of suggestions were made to help her improve in certain areas. Yet, nothing in the report indicates she was eligible for special education services. *See also* Tr. at 619 (did not meet criteria for special education services in the area of language.)

A disability interview officer signed a report on July 31, 2000, indicating that Kasseyopia was going into fourth grade that year and had been tutored during the year. Kasseyopia read at the first grade level and could not remember words.[8] Under the impairments section of the report, the officer wrote that Kasseyopia needed help with all academics, needed to be told when to take a bath, to comb her hair and go to sleep. Supposedly, she was unable to get along with others. This information appears to have been given to the officer by the mother or Kasseyopia since other school reports indicated that Kasseyopia got along well with peers and adults. [Tr. at 294.] According to the report, Kasseyopia wanted to eat all the time. Her kidneys/bladder were all right. She had a tendency to hold her urine. Once or twice a week, she had small fecal accidents and could not feel

___

[8]It is not clear from the report who made this determination or whether this is what Kasseyopia's mother was telling the officer. Earlier school reports indicated that Kasseyopia was reading at the second grade level when in third grade.

it. [Tr. at 294.] The report also indicates that Kasseyopia might need to wear a diaper. Her back pain did not hurt all the time but did if she played too much. She could not take physical education and could not run fast or skip. She could kick a ball. [Tr. at 295.] She only took Motrin when she had pain. [Tr. at 296.] Kasseyopia's typical day involved getting up, getting dressed, watching TV, calling friends and going with her parents to do errands. She played with her friends and played golf in the front yard. [Tr. at 299.] The examining officer did not observe any difficulties in Kasseyopia's abilities to sit, walk, stand or use her hands, etc. She wrote that Kasseyopia was a very sweet girl, personable, and socially appropriate. There were no obvious cognitive problems. Her speech and gait were normal. [TR. at 302.]

There are no medical records for the year 2001. The administrative hearing was held on April 25, 2001. The ALJ first explained that Congress had tightened and raised the standards for childhood disability cases. [Tr. at 39.] Kasseyopia's parents provided testimony and stated that Kasseyopia's back bothered her all the time. She had problems standing on her heels and ankles and had had to have a number of surgeries. [Tr. at 47-50.] Lilly Kinnear testified about the possibility of something damaging her daughter's spine that could cause her to be paralyzed. [Tr. at 50.] They initially had taken Kasseyopia for medical follow up appointments every 3 months, then every 6 months but they then were on an annual follow-up schedule. [Tr. at 51.] The ALJ observed that Kasseyopia appeared to walk fairly normally into the hearing, but her mother stated that Kasseyopia complained of her legs hurting. She gave her children's Motrin. Her mother further testified that Kasseyopia would always have pain. It was difficult for her to walk; she could not run, jump rope, skip, play kickball, do push ups or tumble and had a big bubble on her back. [Tr. at 51.] She gagged at night because of a bone sticking out from inside her neck and pushing against her throat. [Tr. at 52.] If she sat in a chair for

a long time, she got stuck and could not get out. [Tr. at 52.] They needed to measure Kasseyopia's head or it would get large. [Tr. at 52.] They probably were going to have to do future surgery on her legs because her hamstring was too short. [Tr. at 53.] Kasseyopia was attending regular classes but Lilly Kinnear added that we "kind of got her on a special ed." [Tr. at 53.] Her bladder problems was all right so far, but she tended to have accidents. [Tr. at 54.] The mother then explained this was more of a problem with her bowels, and that she only had occasional problems with her bladder. [Tr. at 55.] Kasseyopia's father testified that she was blind if she did not use her glasses and could not breathe well at night due to allergies. [Tr. at 55-61.]

On May 16, 2001, Dr. Kenneth Mladinich, a board certified physician in the area of neurology, provided an expert opinion to disability services. He stated that the medical records he was given were insufficient for him to fill out the physical activities form or to determine disability (for example, to determine what she could lift, carry, how long she could walk, stand -- tr. at 630.). However, he listed the following impairments: lumbrosacral meningomylocele, learning disability minimal impairment. [Tr. at 627.] On the basis of the medical records he had to review, he concluded that these impairments did not meet listing criteria. [Tr. at 628.] Based on those records, he also found that Kasseyopia had minimal difficulty with walking and bladder control and learning.

Lilly Kinnear wrote a letter, dated June 4, 2001 to whom it may concern stating that Kasseyopia was unable to lift anything heavy or to do heavy pulling because of back pain. She could not walk very far and her ankle hurt. She could not stand very long and could not jump because it would shock her back. She had to wear disposable briefs because she could not control her stools very much, according to her mother. [Tr. at 631.]

On July 26, 2001, ALJ Johnson issued his decision affirming the cessation of Kasseyopia's benefits. [Tr. at 19-30.] Kasseyopia requested review stating that she was still disabled by spina bifida and that it was a lifelong disease. While she was improved, she was still disabled. [Tr. at 13, 15.]

There are a few medical records from 2002 that were presented to the Appeals Council. [Tr. at 7.] She was seen at Carrie Tingley for a follow up appointment on February 21, 2002. [Tr. at 682.] Kasseyopia was 11 years old then. Her last surgery was over three years ago. While she was seen in October 2001 for right hip pain, she denied any such pain on this date. She was fully independent in mobility. She participated in soccer practice on a purely recreational level and kicked with the right foot. Her pain was only occasional. Kasseyopia's upper spine were entirely straight and upright. Her surgical wounds on the lower spine were well healed. Her upper extremities were normal, and she had excellent range of motion of her hips and knees. She had mild deformity of both feet that was more pronounced on the right side. She had some gait pattern and foot function problems with the right side, and the doctor suggested prescribing an AFO (ankle foot orthosis) for that foot to see if would help. She might need a tendon transfer. She was to be seen in six months for further evaluation.

Another physician at Carrie Tingley also examined Kasseyopia on February 21, 2002 and observed that she was doing much better than a year ago when she reported more pain in her spine and ankles. She had used Ibuprofen since then which had worked very well. [Tr. at 684.] She reported no pain anywhere, although Kasseyopia's mother reported that her daughter complained of ankle pain "all the time." Kasseyopia reported no soiling or enuresis.[9] She was mildly overweight

_____

[9]Involuntary discharge of urine. Dorland's Illustrated Medical Dictionary, 562 (28th ed. 1994).

and had trouble with heel walking. [Tr. at 684.] A urologist at Carrie Tingley reported that as of

February 21, 2002, Kasseyopia was emptying her bladder normally. [Tr. at 686.]

Based on the records before it, the Appeals Council denied Kasseyopia's request for review

on May 23, 2003. [Tr. at 8.]

### Analysis of Allegations of Error

Kasseyopia challenges the ALJ's functional equivalence findings of less than marked

limitations in the domains of: (1) acquiring and using information; (2) moving about and manipulating

objects; and (3) health and well being. Plaintiff does not expressly argue that any of her limitations

in these areas were "extreme;" rather, she asserts that her limitations were "marked." The Court

limits its review to the arguments presented.

### I. Acquiring and Using Information

Under this domain, the Court examines how well a child acquires, learns and uses information.

20 C.F.R. 416.926a(g). For school aged children up to the age of 12, the regulations state that they

should be able to learn to read, write, do math, and discuss history and science. 20 C.F.R.

416.926a(g)(iv). The child should be able to use increasingly complex language to share information

and ideas with individuals or groups. Id. Some examples of limited functioning in this domain

(although not necessarily a marked or extreme limitation, which is dependent on age and medical

evidence, etc.) are failure to understand words about space, size or time; inability to rhyme words;

difficulty in recalling important things learned in school yesterday; difficulty solving mathematics

questions; ability to talk only in short, simple sentences. 20 C.F.R. § 416.926a(g)(3).

Plaintiff first argues here that the ALJ discussed only three reports in making his findings and

that he did not discuss all of the evidence available. In his decision, the ALJ noted that he had made

a thorough review of the medical and other evidence. [Tr. at 28.] In reaching his determination, the ALJ must consider all of the evidence but he need not discuss every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir.1996).

In concluding that Kasseyopia had a less than marked limitation in the domain of acquiring and using information, Judge Johnson relied on her overall mental processing score that fell in the upper range of low average in 2000, her performance and full scale IQ scores from 1997, and an indication that she was doing well in third grade. [Tr. at 28.] The ALJ also referred to other records in other portions of his decision stating that Kasseyopia had only a small problem in completing tasks, absenteeism, mobility and vision while in the third grade. [Tr. at 23.] Her attention span was equal to other nine-year olds and she was not receiving special education services. In addition, Judge Johnson discussed that Kasseyopia had not met the criteria for special education services in the area of language, and that despite the evidence of a learning disability, she had average IQ scores. [Tr. at 24.] The ALJ noted that based on school record information, she was able to complete her assignments, attend class regularly, pay attention, follow instructions and cooperate. [Tr. at 25, 610.]

The 2000 report for Kasseyopia's testing indicates that she worked about the same as other children in her classroom in the areas of work speed, activity, fine motor skills, oral language skills, listening skills and organization skills. [Tr. at 611.] Her teacher also observed that Kasseyopia's motivational interest was higher than that of her peers. [Tr. at 611.] Kasseyopia's test results tended to vary between average and low average. For example, her sequential processing score was below average but her simultaneous processing score was average. Her nonverbal score was average. Her verbal intelligence score was average, but her reading composite score was below average. [Tr. at 613.] Kasseyopia had problems in one nationally standardized academic achievement test, yet she

still was able to obtain generally average scores. [Tr. at 613.] She scored below average on a different standardized test of academic achievement. [Tr. at 614.] An auditory conceptualization test indicated she had difficulty with auditory conceptualization. [Tr. at 614.] She scored average on a visual perceptual test. [Tr. at 615.]

On the learning disability evaluation scale, Kasseyopia had significantly low scores in the areas of thinking, reading, spelling and math. She scored average in her ability to listen, speak and write. [Tr. at 615.] She did not qualify for special education services in the area of speech and language. [Tr. at 616.] The diagnostic communication evaluation from August-September 2000 indicates that Kasseyopia's mother did not have difficulty understanding her daughter and believed that Kasseyopia communicated "really well." Kasseyopia's teacher completed a rating scale comparing her functional language usage in the classroom. Six of the nine areas rated were average, one area was above average (auditory attention), and two received mild difficulty (comprehension of vocabulary and language used to describe). [Tr. at 619.]

While Plaintiff complains primarily that the ALJ did not "discuss" all of these test results and the accompanying report, the Court concludes that substantial evidence supports the ALJ's conclusion that Kasseyopia's limitations were less than marked in the area of acquiring and using information. Certainly, she tested below or low average in some areas, but she frequently tested average in other areas. She was not eligible for special education services. In addition, Plaintiff relies on a teacher questionnaire completed March 6, 2000, in which Kasseyopia's teacher noted that she she was below her grade level in reading, math, writing and spelling. [Tr. at 351-52.] Yet, in the classroom behavior portion of that questionnaire, Kasseyopia was rated as not having a problem in almost all of the 27 categories which included behavior and abilities like speech/language. She was

rated has having a small problem in only four of those categories: difficulty completing tasks, truancy/absenteeism, mobility and vision. [Tr. at 351-52.]

The evidence here does not overwhelmingly suggest a continued impairment that justifies a finding of a marked limitation in Kasseyopia's ability to acquire and use information. In other words, there is not overwhelming evidence to support a finding that her limitation interfered "seriously" with her ability to initiate, sustain or complete activities.[10] 20 C.F.R. § 416.926a(e)(2)(i). Moreover, Plaintiff makes no argument, nor could she, that Kasseyopia's standardized test scores were two standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2).

In looking at the record as a whole, the ALJ's decision was supported by substantial evidence, and there was no error in the ALJ's failure to discuss every record or in his consideration of records from 1997.

## II.  Moving About and Manipulating Objects

With respect to this domain, the regulations direct a consideration of how the claimant moves her body from one place to another and how she moves and manipulates things. These are called gross and fine motor skills. 20 C.F.R. 416.926a(j). Generally, the inquiry involves a look at how the claimant accomplishes a number of actions like rolling the body, rising or pulling oneself from sitting to standing, pushing oneself up, raising the head, arms and legs, balancing one's weight, transferring oneself from one surface to another, moving oneself forward and backwards in space. For children ages 6-12, increasing strength and coordination are considered, along with one's ability to run, jump,

---

[10]The Court also notes that even if after review, it were able to draw two inconsistent positions from the evidence, this would be insufficient to overturn the ALJ's decision. As long as one of those inconsistent positions represents the Commissioner's findings, the decision must be affirmed. Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996).

and throw, kick and hit balls. 20 C.F.R. 416.926a(j)(2)(iv). Examples of limited functioning could include muscle weakness, joint stiffness, sensory loss, trouble climbing up and down stairs, difficulties with sequencing hand movements, difficulties with fine motor movements, poor eye-hand coordination. 20 C.F.R. 416.926a(j)(3).

Plaintiff argues that the ALJ's finding of no marked limitation in this area was not supported by substantial evidence. Plaintiff primarily relies on a few reports which indicated that Kasseyopia's gross motor skills were below her peers and that she had a significant plarovalgus deformity[11] of her right and left feet. She also cites to Kasseyopia's mother's testimony that her daughter's back was bothering her a lot, her legs hurt, she had difficulty getting up if she sat for too long and fecal soiling.

In reaching his finding, the ALJ expressly relied on a number of medical records and reports and incorporated by reference all of the evidence discussed previously in his opinion. [Tr. at 28.] During a September 16, 1999 medical appointment, the urologist noted no incontinence. [Tr. at 529.] The October 21, 1999 MRI results were very good. There was no re-tethering. [Tr. at 526.] On February 17, 2000, Kasseyopia's mother reported she was doing very well. Her previous problems with fecal incontinence were resolved. [Tr. at 523, 525, 708.] On March 6, 2000, her teacher observed only a small problem with mobility. [Tr. at 351.] She was in regular physical education classes. [Tr. at 548.]

A childhood disability evaluation form, dated March 21, 2000, noted only less than marked limitation in Kasseyopia's motor skills. [Tr. at 516.] A disability reconsideration form, dated May 7, 2000, noted that she had problems running, was flat footed, could not jump rope, kick balls, had weak ankles and tired walking. She was able to ride a bike. [Tr. at 286.] The urologist reported on

---

[11]A bent outward, or twisted deformity. Dorland's Illustrated Medical Dictionary, 1791.

May 10, 2000, that all was well with Kasseyopia at this time. [Tr. at 521.] Another childhood disability evaluation form, dated May 25, 2000, indicated less than marked limitations in her motor skills again. [Tr. at 542.] She ambulated well at this time and did not appear to have any urinary or bowel problems. [Tr. at 544, 546.]

The July 31, 2000 report indicates that she could use her arms all right, could walk all right, and could kick a ball. No problems were observed with Kasseyopia's ability sit, walk or stand. Her gait was normal. [Tr. at 293-302.] The ALJ observed Kasseyopia to be able to walk into the administrative hearing with a fairly normal gait. [Tr. at 51.] He considered, however, Lilly Kinnear's testimony that Kasseyopia suffered pain, was unable to run, skip or jump rope, could not play kick ball or do push ups.

The ALJ also considered the medical expert's findings that Kasseyopia had only minimal difficulties in walking, with bladder control and learning. [Tr. at 28-29.] Plaintiff questions the validity of Dr. Mladinich's results based on the expert's concession that he could not reach a determination as to Kasseyopia's capacity for physical activities based on the medical evidence submitted to him. Yet, Dr. Mladinich stated that, based on the records before him, he was able to reach the opnion that Kasseyopia had minimal difficulty walking and with bladder control and learning. [Tr. at 629.] The fact that the records did not provide him with sufficient information to state how many pounds she could lift or how long she could stand or walk presents a different question and does not appear inconsistent with the opinion Dr. Mladinich was able to reach. Moreover, Plaintiff does not supply citations to any evidence that shows Kasseyopia had marked difficulties with walking or bladder control, other than Kasseyopia's mother's allegations which appear inconsistent with objective medical records.

Based on the evidence before the ALJ and thoroughly considered by him, the Court concludes that substantial evidence supports Judge Johnson's finding that Kasseyopia's limitations in this domain were less than marked.

The following records were presented to the Appeals Council but were not before the ALJ. On February 21, 2002, Kasseyopia denied any complaints of hip pain. She was fully independent in mobility. She participated in soccer practice on a recreational level and kicked the ball with her right foot. Her pain was noted as only occasional. She had excellent range of motion in her hips and knees. She had only a mild deformity of both feet and some gait pattern and foot problems. The use of Ibuprofen had apparently resolved any complaints of pain she previously encountered in her ankles or legs. [Tr. at 682, 684.] She emptied her bladder normally. [Tr. at 686.] Again, the record as a whole supports the Commissioner's finding that Kasseyopia had less than marked limitations in her ability to move about and manipulate objects.

### III.    Health and Well-Being[12]

This domain involves consideration of the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on the claimant's functioning that were not considered under the domain of moving about and manipulating objects. 20 C.F.R. 416.926a(l). Examples of limitations in this domain could consist of generalized symptoms of weakness, dizziness, agitation, lethargy, psychomotor retardation, seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight, nausea. 20 C.F.R. 416.926a(4).

---

[12]Even if the Court were inclined to find that the ALJ's findings of a less than marked limitation in this domain were not supported or were erroneous, Plaintiff's claim for benefits would still be found to have been properly denied unless the Court found evidence to support an extreme limitation. This is true because there must be findings of marked limitations in two domains (or of an extreme limitation in one domain).

Plaintiff presents two arguments as to why the ALJ's findings of a less than marked limitation was erroneous or not supported by substantial evidence. She contends that Judge Johnson's reliance on Dr. Mladinich's opinion and on the fact that Kasseyopia takes only Tylenol for pain does not amount to substantial evidence to support his determination.

Again, the Court determines that there was substantial evidence to support the ALJ's findings of a less than marked limitation. The objective medical evidence demonstrates that despite some of Kasseyopia's claimed limitations, she fortunately functions very well and has improved over time. Kasseyopia's spina bifida was characterized as a mild case on a number of occasions. From a very early point in time, her doctors were optimistic. It is true that she has had some surgeries to improve her condition, but those surgeries appeared to have been successful. The fact that she might need additional surgeries and/or treatment in the future is speculative at best. For now, or at least as of 2002, she has been doing well with very few complaints. The fecal incontinence is apparently resolved or no longer, if ever, a significant problem. As of 2002, Kasseyopia was able to play soccer recreationally. Moreover, Ibuprofen resolved any complaints of pain she had. She is able to ride a bicycle and apparently is active socially with her friends.

Kasseyopia has been characterized as a very sweet girl who is socially appropriate and does not present obvious cognitive problems. Her behavior in the classroom almost consistently was observed as appropriate and cooperative, and she got along well with peers and adults. It appears that she attended regular academic and physical education classes at her schools. While she exhibits some difficulties, e.g., with heel walking, jumping rope, skipping, and getting out of a chair after a long period, these difficulties simply do not translate into overwhelming evidence supporting a finding

25

of a marked limitation. This is especially true here where Kasseyopia has demonstrated great ability and courage by overcoming the many challenges she has faced as a result of her condition.

For the reasons stated above, the Court rejects Plaintiff's arguments that consideration of Dr. Mladinich's expert opinion was erroneous or improper. The medical records support the opinion he provided, and Plaintiff does not convince the Court that his opinion was "meaningless." Nor does the Court accept Plaintiff's argument that the ALJ's observations about Kasseyopia's use of Ibuprofen was improper. The regulations for childhood disability cases specifically permit consideration of the medications being used by the child. Contrary to Plaintiff's position, the ALJ did not suggest that Kasseyopia must take a narcotic pain reliever as a prerequisite to find a marked limitation. The fact that in 2002, Kasseyopia reported to her physicians that the use of Ibuprofen essentially resolved her complaints of pain is a proper consideration by the Commissioner.

The Court concludes that there was substantial evidence to support the Commissioner's decision, and that there was no error.

## Conclusion

For all of the above-stated reason, the Court will deny Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing.

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for a Rehearing [Doc. No. 12] is DENIED.

Lorenzo F. Garcia
Chief United States Magistrate Judge